UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

ELAINE L. CHAO, SECRETARY OF LABOR, :
UNITED STATES DEPARTMENT OF LABOR, :
    :
            Plaintiff, :
    :      Civil Action
    v. :
    :      No. 06-0285 (RWR)
WASHINGTON TEACHERS' UNION :
LOCAL 6, AMERICAN FEDERATION :
OF TEACHERS, :
    :
            Defendant. :

---

**CERTIFICATION OF ELECTION**

The election having been conducted in the above matter under the supervision of the Secretary of Labor, United States Department of Labor, pursuant to a Stipulation of Settlement and Order filed February 6, 2007, in the United States District Court for the District of Columbia, in accordance with the provisions of Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 481 et seq.) and in conformity with the Constitution and Bylaws of the defendant labor organization, insofar as lawful and practicable. Having received four complaints that were investigated and found to have no merit concerning the conduct thereof, therefore:

Pursuant to Section 402(c) of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 482(c)), and the authority delegated to me,

**IT IS HEREBY CERTIFIED** that the following named candidates are duly elected to the offices designated:

| | |
|---|---|
| George Parker | President |
| Nathan A. Saunders | General Vice President |
| Joyce O. Armoo | Recording Secretary |
| Sallie Littlejohn | Treasurer |
| Robert Willis | Vice President Senior High |
| Willie Brewer | Vice President Junior High |
| Lorraine J. Smith | Vice President Elementary |
| Maria Lourdes C. Angala | Vice President Special Education |
| Andre Maria Taylor | Vice President Special (Specialized) Services |
| Derek E. Davis | Vice President Career Development |
| Milton Williams<br>Erich Martel | Member-at-Large Senior High (2) |
| Camille J. Locke<br>Agnes Dyson | Member-at-Large Junior High (2) |
| Diane D. Terrell<br>Deborrah L. Hines<br>Pablo Giron<br>Tenia Pritchard | Member-at-Large Elementary (4) |
| Gloria T. Everett<br>Sheila H. Gill<br>Rashida Young | Member-at-Large Special (Specialized) Services (3) |

Attached herewith is a Declaration setting forth the protests concerning allegations that violations allegedly occurred during the conduct of the election and the findings of any investigation of the protests.

Signed this 31st day of October, 2007.

Cynthia M. Downing, Chief
Division of Enforcement
Office of Labor-Management Standards
Employment Standards Administration
United States Department of Labor

DECLARATION OF CYNTHIA DOWNING

I, Cynthia Downing, am the Chief of the Division of Enforcement, Office of Labor-Management Standards (OLMS), Employment Standards Administration, United States Department of Labor (Department). Pursuant to a Stipulation of Settlement and Order filed in the United States District Court for the District of Columbia, on February 6, 2007, OLMS supervised the mail ballot election conducted by the Washington Teachers' Union Local 6 (WTU), American Federation of Teachers, on May 19, 2007. Said election was conducted for the offices of President; General Vice President; Recording Secretary; Treasurer; Vice President Senior High; Vice President Junior High; Vice President Elementary; Vice President Special Education; Vice President Special (Specialized) Services; Vice President Career Development; Member-at-Large Senior High (2); Member-at-Large Junior High (2); Member-at-Large Elementary (4); and Member-at-Large Special (Specialized) Services (3).

Members of the WTU filed pre-election complaints and post-election complaints with OLMS alleging that Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (Act or LMRDA), 29 U.S.C. §§ 481-484, was violated during the conduct of the supervised election. OLMS investigated the allegations. As a result of this investigation as presented herein, I find that the evidence does not provide an adequate basis for finding probable cause to believe that the Act was violated during the election.

On May 9, 2007, Benita Nicholson, an unsuccessful candidate for General Vice President, filed a pre-election complaint with OLMS alleging that, on May 8, 2007, a member of her slate witnessed incumbent General Vice President Nathan Saunders at Hart Middle School

visiting classrooms while teachers were on duty. Section 401(g) of the Act, 29 U.S.C. § 481 (g), prohibits the use of union funds or employer funds to promote the candidacy of any person in an election. Section 401(g)'s statutory proscription against the use of such funds prohibits union officers from campaigning that involves the expenditure of funds in violation of section 401(g). Accordingly, union officers may not campaign on time that is paid for by the union or use union funds or employer funds to assist them in such campaigning. During the investigation, complainant Nicholson stated that she never witnessed the alleged incident, that she did not know what, if anything, Saunders may have said to teachers when he visited the classrooms, and that the member alleged to have witnessed this incident could provide specific information regarding this allegation. However, the witness identified did not cooperate with OLMS investigators and refused to attend any of the interviews that investigators repeatedly scheduled with the witness. Notwithstanding the witness's lack of cooperation, OLMS's review of the security sign in sheets for Hart Middle School disclosed that on May 8, 2007, Saunders signed himself into the school between 12:27 p.m. and 12:30 p.m. and that he listed his destination as the "office." Saunders stated during the investigation that he visited Hart Middle School on May 8 to assess the water damage at the school resulting from a flood that had occurred on May 7. The investigation confirmed that a flood had occurred on that day due to a custodian leaving a sink running on the third floor. The investigation further disclosed that Saunders visited Hart Middle School for a "meet and greet teachers" event. The investigation revealed that during the event the WTU Building Representative for the school (a WTU employee) escorted Saunders through the school hallways and introduced Saunders to teachers. There is conflicting testimony as to whether the "meet and greet teachers" event occurred on May 8 or in June 2007, after the completion of the supervised election. In any event, the principal and the vice principal for Hart

2

Middle School stated during the investigation that they did not witness Saunders campaigning at the school. Further, the investigation disclosed that only twelve WTU members employed at Hart Middle School voted in the supervised election. Saunders ran on the incumbent slate and won the election for General Vice President by a vote margin of 560 votes. The vote margins for the candidates on that slate ranged from 522 votes to 641 votes. Thus, even if Saunders did campaign at Hart Middle School on May 8, as alleged, any such violation did not affect the election outcome. Based on the investigative findings, the evidence does not provide an adequate basis for finding probable cause to believe that the Act was violated.

During the investigation, complainant Nicholson further alleged that incumbent General Vice President Nathan Saunders campaigned at Webb-Wheatley Elementary School. This allegation was not substantiated by the investigation. The investigation disclosed that complainant Nicholson is not employed at the Webb-Wheatley Elementary and that she never witnessed Saunders campaigning at the school. The investigation also disclosed that a visitor's log is maintained at the security desk at Webb-Wheatley Elementary School and that all visitors are required to sign the visitor's log prior to proceeding to the main office. OLMS's examination of the log covering the period from April 10, 2007 to May 25, 2007, disclosed that neither Saunders' name nor the name of any member of his slate appeared on the log. Further, the principal for Webb-Wheatley Elementary School stated during the investigation that she did not recall any candidates campaigning at the school during the election, including Saunders. Thus, the evidence does not provide an adequate basis for finding probable cause to believe that the Act was violated. In any event, only eleven WTU members employed at the Webb-Wheatley Elementary School voted in the supervised election and the vote margins for the incumbent slate ranged from 522 votes to 641 votes. Thus, even if a violation did occur, it did not affect the

3

prohibit the expenditure of union funds for notices or impartial publication of election information. The special notice merely instructed voters mailing their ballots after May 12 to affix the enclosed two-cent stamp to the return ballot envelope to ensure delivery of the ballots by the post office. Such notice, therefore, constituted an impartial publication of election information, and was not promotional or supportive of any person's candidacy. The Act was not violated.

Complainant Corley also alleged that a campaign button distributed by the incumbent slate should have identified the slate's campaign committee, but did not. Section 401(e) of the Act, 29 U.S.C. § 481(e), requires a union to conduct its election of union officers in accordance with the requirements of the union's constitution and bylaws. The investigation disclosed that neither the Constitution and Bylaws of the WTU nor the Constitution of the American Federation of Teachers requires any such identification. Thus, the Act and the respective bylaws and constitutions were not violated.

Complainant Corley also questioned whether the incumbent slate used union funds to finance its campaign. Section 401(g) of the Act, 29 U.S.C. § 481(g), prohibits union financed and employer financed campaigns. Section 401(g)'s statutory proscription against the use of union and employer moneys to promote an individual's candidacy is unambiguous. *See Shultz v. Local Union 6799, United Steelworkers of Am.*, 426 F.2d 969, 972 (9th Cir. 1979), *aff'd on other grounds sub nom., Hodgson v. Local Union 6799, United Steelworkers of Am.*, 403 U.S. 333 (1971). This provision's prohibition includes any cost incurred by a union or an employer, or any thing of value contributed to promote the candidacy of any individual in an election. The fact that a proscribed contribution to a candidate's election efforts may be characterized as *de minimis* provides no defense to a violation. *See Marshall v. Office and Professional Employees*

5

*Union, Local 2*, 505 F. Supp. 121 (D.D.C. 1981) (duplication expense of $6.40 for campaign flyers was a violation). The statute declares that "no moneys" shall be applied for campaign purposes and, as the court noted, "no money mean[s] no money." *Marshall v. Office and Professional Employees Union, Local 2*, 505 F. Supp. at 123.

      Pertinent to this matter, during the investigation, OLMS reviewed invoices, receipts, and cancelled checks relating to the incumbents' campaign. OLMS also interviewed representatives of vendors that provided services to the slate in connection with the campaign. The investigation revealed that the incumbent slate financed its campaign with personal funds and with the personal credit cards of its members. There is no evidence that such financing involved the expenditure of union funds. However, OLMS's review of invoices for services rendered to the incumbent slate by a printing company disclosed that the incumbent slate had not paid the company for the cost of printing certain campaign materials. In particular, a review of invoice number 0080588 from Doyle Printing and Offset Company, located in Landover, Maryland, for $2,346.75, disclosed that the printing company printed 100 campaign posters and 3,000 campaign flyers for the incumbent slate, which the slate retrieved on May 2, 2007. A review of invoice number 0080725, for $1,792.47, disclosed that the printing company printed another 300 campaign posters and 4,000 campaign flyers for the incumbent slate, which the slate retrieved on May 11, 2007. The total cost of the print jobs was $4,139.22. A representative of the printing company stated during the investigation that the company has a general policy requiring customers to pay the cost of a print job no later than 30 days after the company completes a job. In addition, the account manager for the printing company stated during the investigation that the company gives all customers a 45-day grace period from the date of such completion before the company demands any payment. The investigation disclosed that the company completed the

6

incumbent slate's printing jobs on or before May 2 and May 11. Thus, the 45-day grace period expired on approximately June 16 and June 25, respectively. On June 29, the account manager for the printing company informed OLMS that the incumbent slate had not paid the cost of the printing. Nor had the company demanded the slate to make any such payment. Subsequently, OLMS informed the incumbent General Vice President that the slate's failure to make the payment would result in an unlawful employer campaign contribution. On July 19, 2007, the incumbent slate paid the printing company $2,069.58 from the personal checking account of the incumbent General Vice President with check number 896 and paid the company $2,069.61 from the personal checking account of the incumbent President with check number 746. Thus, the slate paid $4,139.19 of the 4,139.22 it owed the printing company. This underpayment was an oversight by the slate and, on July 27, 2007, the slate paid the company the outstanding three cents. The Act was not violated.

      Complainant Corley also alleged that a WTU Vice President harassed a member of his slate while the member was distributing campaign literature outside the building where the Teacher Appreciation Week ceremony was being held. This allegation was not substantiated by the investigation. The investigation disclosed that the WTU implemented and enforced rules restricting the locations where campaign literature could be distributed outside the building while the ceremony was being conducted, that such rules were applied to all persons in a non-discriminatory manner, and that the WTU did not favor one slate or candidate over another in the enforcement of such rules. Consequently, although the WTU imposed restrictions prohibiting individuals from distributing campaign materials in certain areas outside the building during the ceremony, all candidates and their supporters were permitted to distribute such materials in non-restricted areas outside the building. Thus, no candidate gained an unfair advantage over another

candidate. The Act was not violated.

In addition, complainant Corley alleged that the speech that the incumbent delivered during the Teacher Appreciation Week ceremony constituted campaigning. This allegation was not substantiated by the investigation. Section 401(g) of the Act, 29 U.S.C. § 481(g), prohibits the use of union funds to promote the candidacy of any person. The courts have interpreted section 401(g) very broadly, finding that a variety of actions by unions violate the proscription on the use of union funds to support candidates. *See, e.g., Brennan v. Sindicato Empleados de Equipo Pesado, Construccion Y Ramas Anexas, Inc.*, 370 F. Supp. 872, (D.P.R. 1974) (campaign speech delivered by incumbent officers in union hall); *Hodgson v. Liquor Salesmen's Union, Local 2*, 334 F. Supp. 1369 (S.D.N.Y.), *aff'd*, 444 F.2d 1344 (2d Cir. 1971) (union newspaper articles praising incumbents and criticizing opponents). *But see Camarata v. International Brotherhood of Teamsters*, 478 F.Supp. 321, 330 (D.D.C. 1979) (union newspaper articles permitted "so long as such coverage is addressed to the regular functions, policies and activities of incumbents as officers involved in matters of interest to the membership, and not as candidates for reelection. . . ."). The provisions of section 401(g) prohibit any showing of preference by a labor organization or its officers that is advanced through the use of union funds to criticize or praise a candidate. Such campaigning would constitute a violation of section 401(g) regardless of the amount of the expenditure. Generally, courts, in deciding whether incumbent officers violated the proscription of section 401(g), have held that section 401(g) of the Act was violated when the tone, content and timing of a union publication effectively encouraged and endorsed the reelection of the incumbent officers. *See, e.g, Donovan v. National Alliance of Postal and Federal Employees*, 566 F. Supp. 529, 531-32 (D.D.C. 1983), *appeal dismissed*, 740 F.2d 58 (D.C. Cir. 1984). At least one court has applied this analogy to a

8

campaign speech delivered by an incumbent officer to an assembly at a union hall. *See, supra, Brennan v. Sindicato Empleados de Equipo Pesado, Construccion Y Ramas Anexas, Inc.* The court, in deciding whether the incumbent officer violated the proscription of section 401(g), looked to the tone, content and timing of the speech. As a result, the court held that section 401(g) of the Act was violated in that the speech effectively endorsed the reelection of the incumbent officer and that such endorsement had been advanced with union funds or other thing of value. *Id.* at 878. The Department has adopted the analytic approach enunciated by the court in *Sindicato Empleados de Equipo Pesado, Construccion Y Ramas Anexas, Inc.* In so doing, the Department, in assessing whether a speech that was delivered by an incumbent officer to a captive audience effectively endorsed the incumbent's reelection, will look to the tone, content and timing of the speech. The Department will find a section 401(g) violation if the timing of the speech was such that it can be considered to be related to the upcoming election, the tone and the content of the speech effectively promoted the reelection of the incumbent officer and such promotion was advanced with union funds.

Pertinent herein, an undetermined number of WTU members attended the WTU Teacher Appreciation Week ceremony on May 6, 2007, at which the incumbent president addressed a captive audience. The WTU sponsored and financed the ceremony. The WTU recorded the ceremony and OLMS viewed and listened to the recording. The speech lasted approximately five minutes. With respect to the timing of the ceremony, the investigation showed that the WTU held the ceremony six days after the election ballots had been mailed to members. Thus, the event occurred during the impending election. As to the tone of the speech, OLMS's review of the recording revealed that the tone did not encourage or endorse the reelection of the incumbent officers and was not critical or laudatory in nature. With regard to the content of the

speech, in general, the incumbent President thanked the executive board for its hard work and briefly mentioned the city government's plan to take over the public school system and efforts the WTU had made to address that issue. The speech did not include affirmative statements about the incumbent candidates or make references to opposition candidates. Nor did it include statements that showed a preference by the WTU or its officers for a particular candidate by criticizing or praising a candidate. Further, the incumbent President did not solicit members' votes during the speech. Thus, the evidence does not provide an adequate basis for finding probable cause to believe that the tone, content and timing of the speech effectively encouraged or endorsed the candidacy of the incumbent slate or that it criticized the candidacy of the incumbents' opponents. No violation occurred.

In addition, complainant Corley alleged that the automated telephone calls (Robo calls) that the WTU placed to members' home telephone numbers during the election were excessive and supportive of the incumbent slate. On April 2, 2007, OLMS requested the company that the WTU used to place the automated calls to provide the agency with information regarding calls that the company already had placed for the WTU and information concerning any future calls the WTU had scheduled with the company. In response to this request, the company provided OLMS with documentation showing the dates that the automated calls had been placed and files containing several of the automated messages for calls placed on and before April 2, 2007. OLMS's review of these recordings disclosed that none of them was promotional or supportive of any candidate or slate. The messages generally concerned teacher status letters that approximately 600 members had received and issues surrounding the city government's proposed take over of the public school system. Further, OLMS reviewed all automated messages for calls made to members on and after April 2, 2007, before such calls were placed.

Such recordings concerned impartial election information regarding the duplicate ballot process and the postage rate increase. The Act was not violated.

In connection with the WTU's use of a list of members' home telephone numbers to generate the automated calls, complainant Corley represented that such list should have been but was not made available to his slate. Section 401(c) of the Act, 29 U.S.C. § 481(c), prohibits a union from discriminating in favor of or against any candidate with respect to the use of lists of members. The Department of Labor has interpreted this anti-discrimination provision of the Act as requiring unions to be scrupulously evenhanded about the use of union membership lists. *See* 29 C.F.R. § 452. 71(b); *see also Marshall v. Laborers, Local 74*, 101 LRRM 2391, 2393 (D.D.C. 1979) ("the enactment of 401(c) by Congress was a clear expression of the congressional policy to proscribe all discrimination in the use of lists of union members in the election of union officers."). As previously stated, the automated messages were non-partisan and did not promote the candidacy of any person. Further, the WTU did not make a list of members' home telephone numbers available to any candidate or slate, including the incumbents. Thus, there was no discrimination in favor of or against any candidate or slate with respect to the use of a list of members. The Act was not violated.

Complainant Corley further alleged that candidates violated a regulation prohibiting the posting of campaign posters at the schools. Complainant Corley was not able to point to any school or other regulation proscribing the posting of campaign posters. Further, the respective bylaws and constitutions of the WTU and the American Federation of Teachers do not prohibit such postings. The Act was not violated.

Finally, complainant Corley alleged that the WTU improperly disqualified eligible members who intended to run on the Rier/Corley slate from candidacy and that such

disqualification resulted from deficiencies in the WTU membership list and the payroll records. The investigation did not substantiate this allegation. Section 401(e) of the Act, 29 U.S.C. § 481(e), provides that "every member in good standing shall be eligible to be a candidate and to hold office." Pertinent to this matter, in order to satisfy the WTU candidacy eligibility requirements, a member had to be a current employee of the District of Columbia Public Schools (DCPS) or the Nation's Capital Child and Family Development and a full dues paying member of the WTU. With one exception, all of the eligible WTU members were employed by the DCPS as teachers or in related professions. During the supervised election, candidates were required to be nominated in order to be elected and nominations were made by petition. A potential candidate was required to submit a nominating petition containing the signatures of at least 20 individuals who were full WTU dues paying members for nominations to office. In order to verify the eligibility of potential nominees and members who had signed the petitions, OLMS reviewed DCPS union dues deduction reports, the WTU membership records, payroll reports, and other related records. Prior to such review, OLMS made substantial efforts to ensure that such records were updated and reflected accurate information. A review of these documents showed that Leslie Broadway, Gwendolyn Bowman, G. Vernon White and Patricia Sparger, all prospective members of the Reir/Corley slate, had failed to satisfy the candidacy eligibility requirements and, thus, they were properly disqualified from candidacy. In particular, the investigation showed that neither the WTU nor the pay and retirement office had a membership application on file for Leslie Broadway. The investigation further showed that Broadway was not a full dues paying WTU member but that he paid an agency fee to the WTU for expenses associated with negotiating and administering the collective bargaining agreement. Nor did the investigation disclose that Broadway had signed a voluntary dues deduction form or similar

document authorizing DCPS to withhold full union dues for payment to WTU. The evidence substantially demonstrates that Broadway was not eligible for candidacy. Thus, the evidence does not provide an adequate basis for finding probable cause to believe that Broadway was improperly disqualified from running for office.

In addition, OLMS was not able to locate the name of Gwendolyn Bowman, aka Gwendolyn Corley, in the WTU membership records or on the dues deduction report for the pay period ending March 31, 2007, and the WTU did not have a membership application on file for Bowman. The investigation disclosed that Bowman is a former vice principal and that the code on her pay stub as well as the one listed in the pay and retirement office's database indicates that Bowman is a member of a bargaining unit represented by the Council of Schools Officers (CSO). The investigation disclosed that the CSO is a collective bargaining representative for school administrators and that it is a separate entity distinct from the WTU. Further, the office manager for the CSO stated during the investigation that the CSO dues deduction report showed that the DCPS withholds Bowman's union dues for payment to the CSO. These investigative findings sufficiently demonstrate that Bowman was not a full dues paying member of the WTU, as mandated by the WTU candidacy eligibility requirements. Consequently, she was not eligible to run for office. Therefore, Bowman was properly disqualified from candidacy. No violation occurred.

With respect to G. Vernon White, the DCPS payroll records indicated that he is not a full dues paying WTU member but that he pays only an agency fee to the WTU for expenses associated with negotiating and administering the collective bargaining agreement. In addition, neither the WTU nor the pay and retirement office was able to locate a WTU membership application for White. Nor was he able to provide a copy of such an application to OLMS.

Further, the investigation did not disclose that White had signed a voluntary dues deduction form or similar document authorizing the DCPS to withhold full union dues for payment to the WTU. Thus, the evidence does not provide an adequate basis for finding probable cause to believe that White was eligible to run for office. Thus, he was properly disqualified from candidacy.

Finally, OLMS's review of the nominating petition submitted by Patricia Sparger disclosed that it contained 29 signatures but that only 18 of them were the signatures of full dues paying WTU members. Candidates were required to obtain the signatures of at least 20 such members for nomination to office. Having failed to satisfy the signature requirement for nomination to office, Sparger was properly disqualified from candidacy.

Based on the aforementioned investigative findings, there is not probable cause to believe that any individuals intending to run on the Rier/Corley slate were improperly disqualified from candidacy or that such disqualification resulted from deficiencies in the WTU membership records or the payroll records.

On May 25, 2007, Elizabeth Davis filed a complaint with OLMS alleging that the incumbent slate used union funds to advance their campaign. The investigation did not substantiate this allegation and complainant Davis refused to be interviewed by and cooperate with OLMS investigators in connection with the investigation of her complaint. Notwithstanding Davis's lack of cooperation, as previously discussed, the evidence substantially demonstrated that the incumbent slate's campaign did not involve the expenditure of union funds or employer funds. The Act was not violated.

Complainant Davis also alleged that the incumbent slate visited teachers at various DCPS schools during regular business hours to promote their campaign. Complainant Davis did not provide OLMS with the names of any incumbent slate members who engaged in the alleged

14

campaigning. Further, the evidence did not disclose any campaign violation affecting the election outcome.

Complainant Davis also alleged that the incumbent slate promoted its candidacy during the Teacher Appreciation Week activities. Section 401(g) of the Act, 29 U.S.C. § 481 (g), prohibits the promotion of any candidacy that involves the expenditure of union funds or employer funds. The investigation did not disclose that the incumbent slate used any such funds to assist it in campaigning. Nor did the investigation disclose that the slate campaigned during the Teacher Appreciation Week activities. The investigation disclosed that the speech that the incumbent President delivered during the Teacher Appreciation Week ceremony did not constitute campaigning, as it did not encourage or endorse the reelection of the incumbent officers. Nor did the speech include statements that showed a preference by the WTU or its officers for a particular candidate or slate by criticizing or praising a candidacy. Further, the speech did not contain any language that may be construed as the solicitation of members' votes. The Act was not violated.

In addition, complainant Davis alleged that, during the election process, the incumbent slate was afforded access to members by placing unlimited automated telephone calls to members' homes and by conducting various mailings to members. As previously discussed, OLMS's review of recorded messages that the WTU had placed to members' homes telephone numbers disclosed that the calls were non-partisan and were not promotional or supportive of any candidate or slate. The messages concerned legitimate union matters of interest to the membership and impartial election information. Further, OLMS reviewed all automated messages for calls made to members on and after April 2, 2007, before such calls were placed. The calls concerned election information regarding the duplicate ballot process and the postage

15

rate increase. Similarly, OLMS examined all mailings conducted by the WTU before such mailings were sent to members and none of the mailings was promotional or supportive of any candidate but concerned legitimate union matters. The Act was not violated.

Further, complainant Davis alleged that members did not receive ballots in time to vote. Section 401(e) of the Act, 29 U.S.C. § 481(e), provides that every eligible member shall have the right to vote for or otherwise support the candidate or candidates of such member's choice. The investigation disclosed that on April 30, 2007, Mac Systems, a private mailing service, mailed election ballots to 3,770 eligible voters. The election ballots were mailed approximately three weeks prior to the May 19 deadline for voters to return their voted ballots in order for such ballots to be counted. Thus, voters were afforded a reasonable time period within which to receive, mark and return their voted ballots in advance of the designated deadline. In addition, the investigation substantiated that notices informing members that the election ballots had been mailed on April 30 were posted in at least 151 of the 152 DCPS schools and placed in each teacher's employee mailbox located at the schools. The notice further indicated that any member who did not receive a ballot in the mail by May 3 should contact the election supervisors, provided the election supervisors' contact information, and provided the duplicate ballot request procedures. Thus, any member could have requested a duplicate ballot as early as May 3, received such ballot, and then mailed it back in time for it to be counted. Further, with one possible exception, the investigation corroborated that notice of the election was posted at all of the DCPS schools, and that it was placed in each teacher's employee mailbox and mailed to the last known home address of each member at least 15 days prior to May 19, the date by which the voted ballots had to be returned. Based on these investigative findings, the evidence sufficiently demonstrates that all eligible voters were afforded a reasonable opportunity to exercise their right

to vote for or otherwise support the candidate or candidates of their choice. The Act was not violated.

Finally, complainant Davis alleged that the WTU did not hold a candidates' forum so that candidates could express their views to the membership prior to the election. The investigation showed that neither the WTU Constitution and Bylaws nor the Constitution of the American Federation of Teachers requires the WTU to conduct such a forum. In any event, the investigation disclosed that the WTU complied with all reasonable requests of candidates to distribute campaign literature to the membership at a candidate's expense and similar distribution under the same conditions was made available for all candidates. *See* 29 C.F.R. § 452.67. The Act was not violated.

The Department has concluded from its investigation that WTU's May 19, 2007 election of officers, conducted under OLMS's supervision, complied with Title IV of the Act and was conducted, insofar as lawful and practicable, in accordance with the Constitution and Bylaws of the WTU and the Constitution of the American Federation of Teachers. Therefore, no reason exists to overturn the results of this election.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 25th day of October, 2007, in City of Washington, District of Columbia.

Cynthia Downing, Chief
Division of Enforcement,
Office of Labor-Management Standards,
Employment Standards Administration,
United States Department of Labor

17